I have on the line with me Judges Mabee and Porter and we have some questions for both of you. So let's begin, if we may, with counsel for appellant. Good morning, Your Honor. This is Brian Barnes for the plaintiff's appellants and may it please the court, with the court's permission, I'd like to reserve four minutes for rebuttal. Yes, sir. That motion is granted and please begin. Thank you, Your Honor. Like the Bridge case, this case concerns a government program or distributing a fixed pot of valuable assets according to a mechanical set of allocation rules. Every year, the Pennsylvania General Assembly appropriates a limited amount of money for the Extraordinary Expense Program, and when that money is insufficient to cover all of the extraordinary expenses of participating hospitals, it's distributed on a pro rata basis according to the amount of claims that each hospital submits. Mr. Barnes, while your recitation of the facts is scintillating, at the moment I'm going to interrupt you because my colleagues and I are intimately familiar with the case, but that's okay. Very well, Your Honor. Okay. So my question to you is, you know, in thinking about proximate cause and the district court's ruling, let me ask you this question about DHS and or its actions here. Is there any scenario in your view in which DHS could be deemed or considered to be an intervening factor breaking the chain of proximate causation? Not on the facts presented here. I think we would have a different case, though. Rather than a mechanical rule for allocating funds under the program, you know, basically rather than having a rule where the money is distributed on a pro rata basis, if we had a case where the department had discretion in deciding how much money to allocate to each participating hospital, I think that would potentially make a difference to the proximate causation analysis. Let me ask you just one follow-up before my colleagues jump in. In this dynamic, is there any circumstance in which DHS would, at the end of the fiscal year, keep any of the money? As I understand it, and you'll correct me if I'm wrong, the EE funds, let's say the EE funds total $100. The way this is situated, DHS will distribute $100 in a fiscal year. Is that right? That's mostly right. It's right with respect to the fiscal years that are at issue in this case. The one situation where it wouldn't be right is if you can imagine if all participants in this program, in your Honor's hypothetical, had a total of $90 in extraordinary expenses and the state legislature had allocated $100 for use by this program, in that scenario the state would retain $10 after distributing, you know, the $90 that program participants were entitled to. Yes, okay, I get it. So you answered the essence of my question, which is unless it's undersubscribed, there's no recoil of money, if you will. It's going to go to the hospital unless it's undersubscribed. Got it. This is Jim Porter. Has there ever been a year when it was undersubscribed? You know, as I stand here, I'm not certain of the answer to that. There may have been such years. At least not for the evening question, though, right? That's right. Certainly for 2010 through 2012, the program was oversubscribed. Okay, let me ask you a question. When was the moment when St. Luke's was injured? You know, I guess I want to distinguish between when St. Luke's suffered an injury and when it became aware of the injury. So I would say that St. Luke's was injured when it received each of these program payments under the EE program, and it received less from the program than it would have received had the defendants not submitted a bunch of fraudulent claims to the program. But that's, I think, a distinct inquiry from when we became aware of the injury, which would have happened basically when the Auditor General's reports came out and revealed the fact that, you know, this fraud had been perpetrated on, you know, the program participants that had submitted, you know, honest submissions to the program. Let me just follow up then, not on the awareness issue but on the injury. Why do you say the injury occurred when St. Luke's received smaller payments rather than saying we were injured the moment that Lancaster General submitted these allegedly fraudulent requests? Well, I guess there would be a question there about the ripeness of the claim for purposes of RICO, but I think, you know, until St. Luke's is in a position where, you know, it would have money in its pocket that it, you know, doesn't have as a result of the defendant's fraud, I don't think it suffered an injury. Yeah, that's fair. Okay. Judge Porter? Yeah. I'm sorry. Go ahead. This is Judge Porter again. I have a follow-up question. I guess you don't know who the John Does are, one and two? Do you have an inkling who they are? I do not have an inkling who they are. You know, we know that some human being within the Lancaster General operation was responsible for submitting these claims to the program for reimbursement, but that's a bit of information that is just, you know, in the exclusive possession of the defendants and what we just don't know. Does it matter whether you know who they are for purposes of your blue line particularity requirements? I don't think that it does. Certainly the defendants have not raised that as an issue in this appeal. In fact, I'd say, you know, if you read the defendant's brief, they don't make any reference to Rule 9B at all, and I think the reason is because if you look at the complaint, we do provide in pretty specific detail, you know, the particulars in terms of when the communications that we allege were fraudulent occurred, what the communications said, why we think they were fraudulent, and I think that's sufficient for purposes of Rule 9B, and certainly to the extent that it's not, I think the defendants have forfeited any argument to the contrary. Okay. Tell me about, let's discuss plausibility for a moment. As you think about plausibility, is there any question that you've pled enough to hurdle whatever minor threshold there is? I don't think there is, Your Honor. I mean, and the thing, I think the really key point here is that if the court examines the Auditor General's reports, it's clear that Lancaster General was just a major, major outlier in this program. You know, it's one hospital of 70 hospitals that participated in the program that submitted enough claims to collect 35% of all of the money under the program during these years, and, you know, there's obviously a methodological disagreement between the Auditor General and the Department about exactly how one should go about calculating the appropriate amount of payments to each program participant, but the key point is that the Auditor General used the same methodology across all program participants, and what the Auditor General found is that 75% of the claims submitted by Lancaster General were invalid, whereas in contrast, 10% of other program participants' claims were invalid. And so when there's the same methodology being applied to all of these hospitals, Lancaster General jumps out as this tremendous outlier, and it's an outlier not just in a single quarter or a single year. This is something that continued for over five years, and I think for that reason as well, there's a very strong inference that, you know, we have defendants who are making invalid submissions over a lengthy period of time, and those invalid submissions collectively rebound to Lancaster General's benefit to the tune of nearly $9 million. And I think, you know, when you put all of that together, there's just a very, very strong inference that the defendants knew that the claims they were submitting to this program were invalid. And I think it's also important to, you know, think about the chronology here, which is basically that the first Auditor General report that comes out that's critical of Lancaster General's submissions, it comes out in the middle of fiscal year 2012. And then in fiscal year 2013, the number of claims that Lancaster General submitted to the program precipitously drops. And so what we see is basically the Auditor General coming in and doing something that the department never did, which is actually looking at the underlying billing records of Lancaster General and saying, wait a minute, a lot of these claims are invalid. And it's only at that point that the number of claims that was submitted by Lancaster General precipitously drops. And so, you know, for that reason as well, I think there's a very strong inference of fraud. I want you to take a look at for a moment the three recited intervening factors in the district court's opinion. You've alluded to one of them, the Auditor General's report, a moment ago. But in saying that there was a gap in the approximate causation, the district court looked at these three factors. I wonder if you could speak to them and why we should look differently at those factors and come to a different conclusion. Sure. And if the court could direct me to the relevant page of the court's opinion to the extent that it's listed. Yeah. It's page 18 of the district court opinion, the paragraph that begins, like in Holmes. Right. And then in the middle of the page, the court says, first, each hospital may submit extraordinary expense claims. And that's one of the factors that the court discusses. Right. And I think that each of these factors, there's a direct parallel to the bridge litigation. So, you know, each hospital submitting extraordinary expense claims for charity services offered, that's, you know, the analog in bridge is participants in this auction submitting bids. Right. And so that's, I think that there's a direct parallel there. And then I think the court, let's see, the district court says, once a claim is submitted, the department determines the reimbursement amount for each hospital. That's the analog in bridge is the auctioneer deciding which of the bidders that submitted, you know, identical bids is going to be the winner of the auction for that particular lien. And then finally, the district court notes the auditor general, in this case, you know, identifying the invalid claims. And, you know, the analog in bridge is basically the plaintiffs, in that case, discovering and raising objections about the fraudulent efforts by the defendants, in that case, to collect more of the tax liens than they were entitled to. And so I think each of those factors that the district court identified as potentially intervening factors, there's a direct parallel to the bridge litigation. And, you know, obviously that's a Supreme Court decision that we think is just on all fours. Thank you. My colleagues? Nothing more from me. Nothing from me. Counsel, we'll hear from you on rebuttal. You reserve four minutes. Thank you very much. Thank you, Your Honor. May it please the Court. This is Kevin Fay. I'm a member at Eckerd Samans. Can everyone hear me? Yes, sir. I represent the Appalese Lancaster General Hospital, Lancaster General Health, University of Pennsylvania Health System, University of Pennsylvania Trustees, and John Doe I and John Doe II. I'd like to pick up on the questions that the panel was asking Mr. Barnes, and specifically about the district court's opinion. The proximate cause issue here is what the district court found, that there was no proximate cause, and that was based on the home's direct harm requirements. Let me ask you this question. Let me ask you this question. Let's assume for the moment that there is a fraud, right? Okay, we're going to assume that, and that Lancaster engaged in fraud. What is the harm that DHS suffered? Well, first of all, I'll point out that DHS published a report in 2017, and they re-ran the Auditor General's number. No, no, that's not how this works. You've got to answer my question first. Well, I just want to point out how implausible it is to say that there was fraud here, because DHS. Yeah, but that's not helpful, right? My hypothetical is, assume there's fraud. Okay. And so you're asking, I know what you're getting to here. You're asking whether there is a better plaintiff, and whether DHS constitutes. No, I don't want to know if there's a better plaintiff. I want to know if DHS would suffer harm if your client engaged in fraud. That's all I want to know. I don't think DHS would suffer harm if my client engaged in fraud, hypothetically, because, like you said, it's a fixed pool of money, and so DHS is giving out what it's giving out, and they don't suffer harm one way or the other. The only thing I would point out there is that under the statute, DHS has certain obligations. One of them is that they oversee the program, and there are statutory sections about penalties, and DHS has that power. I think the fact that they didn't exercise that power here is dispositive of this issue of fraud. Here's another hypothetical. If DHS had never implemented the clawback practice, then would St. Luke's have satisfied proximate causation? Well, it's such a counterfactual hypothetical, I almost can't comprehend it. If DHS had never instituted the clawback, then instead of having – well, I'm sorry. I want to make sure I understand your question. You're asking – can you repeat it, please? If DHS had never implemented the clawback practice, then would St. Luke's have satisfied the proximate causation? I don't think we would be here if DHS had never implemented the clawback process. I don't think – you know, everything kind of springs from that decision, to do it and then to discontinue doing it. And it was the discontinue doing it which is what caused plaintiffs' alleged harm. It caused them to believe they were harmed. It was a policy decision made by DHS that had nothing to do with Lancaster General, and it was program-wide. It arose because DHS realized – they asked themselves, do we need to continue doing this burdensome audit, clawback, redistribution process? But that's not the stage of this litigation that we're at. You're saying, look at the evidence. This can't possibly have happened. We're at the pleading stage, right? And what the Lancaster – I'm sorry. The plaintiffs have said Lancaster has engaged in particular activity. There's no 9B question here. Judge Porter mentioned 9B before, and appropriately so, but there's no question of 9B particularity. So we're not there. It's not that they haven't pled a good enough case. Now, if they allege fraud and the DHS has decided to no longer engage in a clawback procedure, that's a question that's beyond the purview of our court looking at a motion to dismiss. All we want to know is, based on what they've pled, one of the questions is, is it plausible? Another question is, have they pled proximate causation? You know, what clawback means and how that should be interpreted, from my perspective, and tell me if you disagree, is not a question we should be delving into at this moment. Well, the question you have to delve into is whether plaintiffs' allegations of racketeering plausibly aligned with the documents that they attached to their complaint, namely the AG reports. And the evidence here shows, plainly, that the AG reports were fatally flawed and that the decision to discontinue the clawback arose from DHS's realization that these reports were defective. And that's why there's no proximate cause, because that decision led to the harm. I thought they stopped the clawback because they realized it was illegal. They realized that there was no authority in the statute for the clawback. And that's why the facts here are unique. It's because they actually were doing a program for 12 years that was ultra-virus, that was beyond what was allowed in the statute. And so if they never had authority to do the clawback in the first place, then how can their decision to stop it undermine St. Luke's RICO standing? Because it was the very discontinuation of the program, which is what caused St. Luke's to believe it was harmed. So what you're telling us is, in the following hypothetical, there'd be no relief possible. Let's assume for a moment that Lancaster has engaged in fraud, okay? And DHS, we know, based on your earlier response, is not harmed. That that fraud, I'm sorry, no party may seek redress from that fraud. What I'm saying is, even assume that Lancaster General submitted intentionally, purposefully submitted overinflated claims. When they did that in 07, plaintiffs weren't harmed. They weren't harmed because the clawback process was in place to make sure all payments got redistributed according to whatever the AG said. And so there's no harm in 07. There's no harm in 08. There's no harm in 09. There's no harm in 10. No harm in 11. No harm in 12. No harm in 13. And then in 2014, DHS decides that they're not going to do this clawback process anymore, and that's when the harm arises. So it's not direct, and it arises from DHS's decision. So even if Lancaster General submitted overinflated claims, plaintiff's harm was caused by the agency's decision and not by Lancaster General supposedly committing fraud in the form of these predicate acts that started in 2007. That was a wonderful answer. It did answer my question. My question is, when you have a scenario where this is a hypothetical, so the facts of the case aren't helpful at the moment, if Lancaster engages in fraud, and we know that DHS, based on your earlier response, is not harmed, then you're essentially saying that the plaintiffs would have no remedy if Lancaster had engaged in fraud. If Lancaster had engaged in fraud, plaintiff's remedy – I guess I'm not following the question. And the reason I'm not following the question is because I don't think it's fair to start from this inference of fraud.  I substituted your word fraud for this concept of intentionally submitting overinflated claims. And to me, those are really – Well, the reason that I start there is because the opinion of the district court focuses on proximate causation. So we're focused on proximate causation. And the district court's opinion talked about intervening factors. And it talked about the AG's report, and it talked about DHS's intervention, and essentially who would be the better plaintiff. And I think that I'm informed by some of your responses. I know that DHS, in this particular circumstance, will not, cannot suffer harm. Because, as I understand, and you'll correct me if I'm wrong, the EE funds are distributed to all of the hospital and healthcare systems who make submissions that are approved. And essentially, for the life of the program as it's operating here, there have been more claims than there has been funds to distribute. So that means there's no circumstance where DHS finds itself with funds at the end of the fiscal year. So I'm just trying to figure out, as we look at the case and we look at the assertion of fraud, and there's no particularity issue that we have to deal with because that's not on the table, it's a hypothetical. If Lancaster and the hypothetical engages in fraud, then there must be some relief possible to those who believe they have been defrauded. And I'm really focused on how do the intervening factors essentially... I understand. I understand what your question is. Okay, good. Thank you. So if Lancaster General had engaged in fraud, the facts here would be totally different. And what Planoff hasn't alleged here is any type of concealment on the part of Lancaster General. In other words, Lancaster General's books were open to everybody. They were open to the auditor. They were open to DHS, okay? And so we had one look at these numbers by the AG in 2014. Then we had another look at these numbers by DHS in 2017. And there was no finding by DHS of any funny business. So to have this presumption of fraud I don't think makes sense for that basis. Now, I want to... But we do that because we're hearing this case on a 12B6 motion. That's why. So you guys can duke it out whether there was fraud or not if you go back. But for the moment we're assuming there was fraud and we're trying to figure out the causation issue. Right. And so there's the three elements from Holmes. There's directness, which we talked about. And then there's this idea of whether there's going to be complicated rules for apportioning liability among indirect and direct plaintiffs, plaintiffs who suffered harm at different levels. And Judge Schmell spoke to this issue. And he recognized that there was a dispute between DHS and the AG. And the significance of that dispute is that the AG's numbers were off, that you can't trust the AG's numbers. They applied all of these methodologies that contravened the TSA. They looked at claims that had never been submitted to the PHC4 portal. So what you have is that Judge Schmell recognized, well, the fact that there was a dispute here and the fact that there was flaws in the AG's report means that a court looking at this in terms of proximate cause is not going to be able to sort out these apportionment issues because contrary to what plaintiff says, you can't just take the AG reports and that's going to be the solution for how you're going to reallocate this money. A court would have to step in. It's not the plaintiff's claim that all they're going to do is come in and slap the AG's report on the table and that will be the end of the case. We're at the pleading stage, as Judge Porter just alluded to. So we're essentially just looking at the plaintiff's complaint and saying, can this go forward? And it's not, is this the best case? It's not, you know, you've probably seen dozens of antitrust cases that are way, way more difficult both practically and theoretically than this. I mean, so, you know, the notion that this is too complex and, you know, that satisfies one of the Holmes requirements I think is not particularly persuasive. Well, I just want to point out that what Judge Schmell said about this apportionment issue and recognizing, well, I'm sorry, did you have another question? No. Judge Porter? No, I don't. Judge Beatty? No, I'm fine, thank you. If I had one more minute, I would like to just say one last thing on that issue we left off on. Yes, sir. And so there's the three elements in Holmes, directness, this apportionment issue, and then this third issue, which is what the court seems to be interested in, and this is whether there is a better plaintiff who can vindicate the alleged harm. And the Supreme Court's jurisprudence around RICO is that proximate causation has to be a flexible standard. Not all of these elements are going to be relevant to every question. And to me, you ask, did the plaintiff get a remedy? Yes, the plaintiff got a remedy here, and that is in the form of the DHS 2017 report. When the AG came out with its report in 2014 and said Lancaster General got overpaid by this much money, the legislature, the General Assembly, asked DHS to publish a report and look at this issue. They looked at the issue. They gave St. Luke's a remedy in the form of looking at the issue. And when they came out on that issue, they found that Lancaster General had not been overpaid. In fact, they had been underpaid. And so we're left with this methodological disagreement that Mr. Barnes alluded to between DHS and the AG, and Mr. Barnes says the only possible explanation for that is massive fraud on the part of Lancaster General. But I would submit that those disagreements can be explained by the fact that they disagreed about eligibility criteria for these reimbursement claims. And so it's not a reasonable inference to infer that this can be explained by fraud. It's much more plausible, this element of wrongdoing that plaintiff infers, is not supported by the reports that are appended in the appendix. Why is this bridge, as your colleague suggests, on all fours here? It's because of how the rule operated. Well, first of all, bridge involved direct harm. As soon as the defendants in that case violated the single simultaneous bidder rule, plaintiffs were necessarily harmed and it was immediate. Here, bridge is not on all fours because the predicate acts occurred in 2007 and the harm didn't occur until 2014. There was an intervening act here that didn't exist in bridge. And plaintiff makes this analogy to say that the DHS decision to claw back money is akin to the prosecutor's decision in bridge not to prosecute. And I will submit to you that that analogy is not apt. The DHS decision to discontinue the clawback was nothing like a prosecutor's decision not to prosecute. First of all, this argument wasn't raised in the district court below. Second of all, it comes from looking at the Seventh Circuit opinion, not the Supreme Court decision. But even in view of that, it's not correct because look at DHS's decision. It was a general decision. It applied to all 70 hospitals. By contrast, the prosecutor's decision in bridge applied to one person. They were faced with wrongdoing. Now, plaintiff injects this idea that the AG reports in 2014 were blowing the whistle on Lancaster General and that they were akin to people complaining that Lancaster General was committing fraud. But if you look at the AG reports, they don't say anything like that at all. And if you look at the DHS report, they don't say anything like that at all. So the decision surrounding the clawback was about eligibility criteria and a dispute about how the program should run. It wasn't in order for plaintiff's analogy to be accurate, that decision would have to be infected with some cloud of wrongdoing around Lancaster General. At the time, it was being made, and that's not supported by the records themselves. All right. Thank you very much. Judge Mady, Judge Porter, anything further, gentlemen? No, sir. Nothing further. All right. Counsel, thank you very much. Thank you. We will hear from Helen's counsel on rebuttal. Thank you, Your Honor. Just a couple of quick cleanup points as an initial matter. I think I just heard my friend on the other side suggest that we did not raise before the district court the argument that the clawback decision by DHS is analogous to the decision of a prosecutor not to bring charges in a wire fraud case. If the court looks at our response to the descendant's motion to dismiss, page 31, we make that argument to the district court. Also wanted to note, I think my friend on the other side suggested that DHS disagreed with the underlying determination by the Auditor General that a large number of the claims that Lancaster General submitted were invalid. If the court compares appendix page 200, where DHS describes what it did in connection with this program, to appendix page 165, where the Auditor General describes what his office did, what the court will see is that the Auditor General and only the Auditor General reviewed those underlying billing records of Lancaster General, and so DHS really was not in a position to opine on whether or not a large number of the submissions that Lancaster General made to this program were invalid. We've talked a bit about the Bridge case, but I'd like to try to situate this case more broadly in the context of the Supreme Court's other proximate causation precedents. One overarching theme that we see in Holmes and Anza and Hemingway, all three of the cases where the Supreme Court has rejected RICO claims on proximate causation grounds, is that in every one of those cases there's always a more direct victim who the Supreme Court says is better situated to sue. I think in the red brief in this case, and I think I heard again today, the defendants effectively concede that the department is not a more direct victim because it's in exactly the same position, whether it pays the money to Lancaster General as a result of Lancaster General having submitted these invalid claims, or instead pays the money to the plaintiff and the plaintiff's class. So I think it's clear that the department is not better situated to sue and just simply hasn't been injured in its business or property within the meaning of RICO, and for that reason it wouldn't be a viable plaintiff. Another point that I think comes through very clearly in Holmes and the Supreme Court's other precedents in this area is that there are certain types of causation inquiries that the court is reluctant to have courts get into, where basically the inquiry turns on a lot of very speculative factual questions. So in Holmes there were a lot of speculative questions around, well, why exactly did the broker-dealers in that case fail? And how much of it was attributable to the fraud and how much of it was attributable to bad business practices or the vicissitudes of other things happening in the markets? And there's nothing like that in our case. As I think the court alluded to a moment ago, the facts here are a lot more straightforward than the kinds of facts in which other RICO plaintiffs have been allowed to go forward, and I would commend in particular to the court's attention its decision in Ray Avendia marketing case. That's the leading proximate cause case of the Third Circuit, and the facts there were a lot more complicated than they are here, and on those facts this court allowed a RICO claim to go forward and rejected a proximate cause defense. So for all of those reasons, we would just urge the court to reverse the district court. Thank you, counsel. Counsel, we appreciate your argument, and we will take the matter under advisement, and we wish the best to you and your families in this time of national crisis.